

# NUMBER 13-22-00453-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JASON LYNN MCKNIGHT**
**A/K/A JAMES GREEN**
**A/K/A JAMES MCKNIGHT,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                          **Appellee.**

---

### On appeal from the 252nd District Court
### of Jefferson County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Benavides**

Appellant Jason Lynn McKnight a/k/a James Green a/k/a James McKnight appeals his conviction for failing to stop and render aid in an accident involving death, a second-degree felony for which punishment was enhanced due to the jury's finding that McKnight was a habitual offender. *See* TEX. TRANSP. CODE ANN. §§ 550.021(c)(1)(A), 550.023; TEX.

PENAL CODE ANN. § 12.42(d). The jury sentenced McKnight to 27.5 years in prison. By three issues, McKnight contends that: (1) the evidence was insufficient to show that he acted with the necessary mens rea; (2) the trial court inappropriately allowed a witness to speculate about McKnight's subjective mental state; and (3) the evidence was insufficient to show that McKnight used or exhibited a deadly weapon during the commission of the offense. We affirm as modified.

## I. BACKGROUND[1]

It is undisputed that on March 29, 2020, at around 9:00 a.m., McKnight, driving his Chevrolet truck, struck and fatally injured cyclist Edward Stedman. According to Barrett Lindsay, an eyewitness to the accident, he was driving that day on Delaware Street in Beaumont about "[a] hundred yards" behind a "red or maroon" Chevrolet truck. It is undisputed that this was McKnight's truck. Lindsay observed the truck in "[t]he right lane . . . . driving very close to the curb." Because Lindsay "was doing about 30 miles an hour," he estimated McKnight "was doing about the same." Lindsay then noticed "this lump, helicopter spinning up into the air. It bounced on the hood of the maroon truck, and I think it . . . hit his windshield and then slid off." Lindsay initially "thought it was debris or a trash can," but when he was close enough to discover that the "lump" was actually a person, he called 911. Lindsay testified that it was "[v]ery" apparent that this person needed medical treatment.

Lindsay summarized McKnight's actions after the accident as follows:

Immediately after he hit the bicyclist, he turned on his hazards, slowed down

[1] This appeal was transferred to this Court from the Ninth Court of Appeals in Beaumont by order of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer).

to about 5 miles an hour . . . . He drove—again, I'm not great with distance, but ballpark 100 yards [and] stopped. He stayed stopped for 20, 30 seconds, maybe a minute and then started going again at about 5 miles an hour. He drove for about another 100, 150 yards. I remember he was—you know, at that part of Delaware there comes around a turn and a curve, so he was coming up on the curve in the street, and he stopped a second time and stayed stopped I think a little longer the second time if I remember right, or maybe a minute and then he proceeded—and then he started driving and proceeded on down the road.

Lindsay stayed at the scene and spoke with Officer Jarrett Pantallion of the Beaumont Police Department. Body camera footage from this interaction was admitted into evidence. In this footage, Lindsay states that he was about "thirty yards back" at the time of impact. He explained he did not see anything prior to the collision, but he observed the collision itself. Following the collision, he saw that McKnight drove "100 yards down the road, and turned his hazards on, uh, and then, crept forward at 5 miles an hour another 100—100 yards and then kind of stopped for a minute . . . and then went on forward, but still with his hazards on."

The 911 call Lindsay made was also admitted into evidence. In this call, Lindsay tells the 911 operator that the driver responsible for the accident is about "100 yards" down the road. He then explains that he "can't tell if it's stopping or not" and asks whether he should "go after the vehicle." Later in the call, he explains that the driver of the truck "turned his hazards on 200 yards down the road," but that the driver had since "gone on." At the conclusion of the call, Lindsay can be heard speaking with an unidentified person about the maroon truck and its driver. This unidentified person says, "He knew he hit it," to which Lindsay responds, "Yeah—oh, yeah."

Dr. Orlando Schaening, another eyewitness, testified that McKnight's truck had its

3

hazards on prior to the accident. Dr. Schaening explained that he was about "60 to 70 feet" in front of McKnight when he heard a "very loud thumping sound." Dr. Schaening did not observe the accident in question, but he noticed that "the cyclist was down and he wasn't moving," so he pulled over to render aid.

Jasmine Durst also testified about the collision and the events that followed. According to Durst, she observed "a man's bike flip and he hit the ground." She then noticed that "the driver of the truck, the maroon truck, he kept going, but he kept veering, like, to the right side of the—by the curb, but he kept going. So, we kind strayed [sic] behind him because we w[ere] in shock." Durst said the driver "kinda stopped," and she thought "he was gonna stop and go back," but he eventually "kept pursuing towards the Eastex Freeway area." Durst believed that it was "[v]ery apparent" that McKnight had been involved in an accident, and it was also apparent that the bicyclist needed medical care.

Demitri Oliver was the driver of the vehicle in which Durst was a passenger. He testified that he observed the driver of a truck hit the back tire of the bicycle and then the truck ran directly over the cyclist. Oliver explained the driver "wasn't really going that fast. Like 25, 35 miles an hour." Oliver testified that following the accident, the driver did not stop or slow down, "[h]e kept going." Oliver and Durst both testified that they initially followed McKnight for a short period of time, turned back to check on Stedman, and then attempted to catch up with McKnight again. However, police had already stopped McKnight by the time the two located him.

Dash camera footage from Detective Amber McMichael's police unit was admitted

4

into evidence. In this footage, McKnight's truck is straddling two lanes of traffic while stopped at the intersection of Delaware and Eastex Freeway. McKnight then pulls up next to a pump at a gas station and Detective McMichael begins conducting a traffic stop.

Portions of Detective McMichael's and Officer Ryan Callesto's body camera footage were also admitted into evidence. In this footage, McKnight tells the officers that his vision is impaired,[2] so he ordinarily utilizes a driver. However, he stated that he was on his way to deliver food to his driver, as she had not had anything to eat recently. He stated that he was watching the "white lines" between the lanes of traffic to avoid hitting another car. He acknowledged that he "heard something," and knew he "hit something," but explained that he believed it was a garbage can and "just kept going." When the officers informed McKnight that he hit a person, not a garbage can, he became visibly distraught. He insisted that he thought he hit a gray garbage can, and he also detailed that he did not hear anybody "holler, nothing—nothing like that."

Troy Wagner, an investigator with the Traffic Division of the Beaumont Police Department, testified that "[f]rom the impact site to Lucas [Drive] just before, there's [sic] no driveways." He also explained that residents do not leave their garbage cans out and trash pickup does not take place on the stretch of Delaware where the accident occurred. The following exchange then ensued:

| [The State]: | So, would it be reasonable for someone to assume that they hit a garbage can in that section of Delaware? |
|---|---|
| [McKnight's Counsel]: | Objection. Calls for speculation, Judge. |

---

[2] Medical records indicating that McKnight was diagnosed with cataracts following the accident were admitted into evidence.

| | |
|---|---|
| THE COURT: | Overruled. |
| [The State]: | Would that be reasonable? |
| [Wagner]: | No, sir, it would not be. |

The jury found McKnight guilty of failing to stop and render aid, and it sentenced him to 27.5 years in prison. *See* TEX. TRANSP. CODE ANN. §§ 550.021, 550.023. The jury also made an affirmative deadly weapon finding. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

By his first issue, McKnight argues the evidence was insufficient to establish the mens rea element of the offense.

## A. Applicable Law & Standard of Review

"The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240). In reviewing the sufficiency of the evidence, we consider all the evidence presented in the light most favorable to the verdict to determine whether the trial court was justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

6

"Intent is a question of fact and therefore within the sole purview of the jury," which "may rely on its collective common sense and apply common knowledge and experience" in its decision-making. *Boudreaux v. State*, 631 S.W.3d 319, 328 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (citing *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014)). Intent may "be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Id.*

Section 550.021 of the Texas Transportation Code states:

The operator of a vehicle involved in an accident that results or is reasonably likely to result in injury to or death of a person shall:

(1)   Immediately stop the vehicle at the scene of the accident or as close to the scene as possible;

(2)   Immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident;

(3)   Immediately determine whether a person is involved in the accident, and if a person is involved in the accident, whether that person requires aid; and

(4)   Remain at the scene of the accident until the operator complies with the requirements of Section 550.023.[3]

---

[3] Section 550.023 provides:

The operator of a vehicle involved in an accident resulting in the injury or death of a person or damage to a vehicle that is driven or attended by a person shall:

(1)   give the operator's name and address, the registration number of the vehicle the operator was driving, and the name of the operator's motor vehicle liability insurer to any person injured or the operator or occupant of or person attending a vehicle involved in the collision;

7

TEX. TRANSP. CODE ANN. § 550.021(a). A hypothetically correct jury charge would instruct the jury to find McKnight guilty as charged if he "d[id] not stop or d[id] not comply with the requirements of § 550.021. *See id.* § 550.021(c).

"[N]ot just any accident will trigger the failure-to-stop-and-render-aid duties." *Curry v. State*, 622 S.W.3d 302, 311 (Tex. Crim. App. 2019). "[A] driver must stop and render aid not only if the driver knows that he was involved in an accident and another person was injured or killed," but "also if he knows that he was involved in an accident that was reasonably likely to result in injury to or the death of a person." *Id.* at 309 (internal citations and footnote omitted). Conversely, there are three scenarios in which a driver does not have a duty to stop and render aid following an accident: (1) if he is unaware that he was involved in an accident; (2) if he knows that he was involved in an accident and knows that it did not result in injury to or the death of a person; and (3) if he knows that he was involved in an accident, but it was not reasonably likely that the accident would result in injury to or the death of another person. *Id.* "The culpable mental state for [failing to stop and render aid] is established by showing that the accused had knowledge of the circumstances surrounding his conduct, meaning the defendant had knowledge that an accident occurred, and the accident was reasonably likely to result in injury or death of a

---

(2) if requested and available, show the operator's driver's license to a person described by Subdivision (1); and

(3) provide any person injured in the accident reasonable assistance, including transporting or making arrangements for transporting the person to a physician or hospital for medical treatment if it is apparent that treatment is necessary, or if the injured person requests the transportation.

TEX. TRANSP. CODE ANN. § 550.023.

person." *Boudreaux*, 631 S.W.3d at 327–28.

**B.    Analysis**

McKnight concedes that "[t]he evidence, [viewed] in the light most favorable to the State, established that [he] *may* have committed the offense." Nonetheless, citing *Milligan v. State*, McKnight contends that this is not the sole standard by which we must measure the evidence. 263 S.W. 296, 297 (Tex. Crim. App. 1924) (concluding that the circumstantial evidence was not sufficient "to overcome the presumption of innocence"). As noted, "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 323 S.W.3d at 895; *see Pointe v. State*, 371 S.W.3d 527, 531 (Tex. Crim. App. 2012). We will review the evidence under this well-established standard.

In applying this standard, we conclude that the evidence is legally sufficient. There was contradictory testimony from the eyewitnesses concerning McKnight's actions following the accident. But it is the jury's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319). It is our duty to defer to the jury's resolution of conflicting evidence. *Id.*

Lindsay testified that he observed the driver of the maroon truck turn his hazards on following the accident. He also testified that the driver slowed down and made two separate stops. This contradicts McKnight's statement to officers that he "just kept going." *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept

one version of the facts and reject another, and it may reject any part of a witness's testimony."). The jury was also able to consider Lindsay's testimony, the statement he made to Officer Pantallion following the accident, and his contemporaneous statements made during the 911 call. Specifically, in his statement to Officer Pantallion, Lindsay recounted that about "100 yards down the road," the driver "turned his hazards on" and "then crept forward at 5 miles an hour another . . . 100 yards," then "kind of stopped for a minute" and "then went on forward, but still with his hazards on." During the 911 call, Lindsay stated that he "can't tell if it's stopping or not" but that he believed the maroon truck was leaving the scene. In the call, he later remarks that the driver of the maroon truck turned on his hazard lights "200 yards down the road, but he's since gone on."

The jury, in evaluating Lindsay's account of McKnight's actions with their collective common sense, could have rationally concluded that when McKnight turned his hazards on, slowed down, and made two separate stops, he was contemplating whether to turn back and check on the accident he caused. *See Boudreaux*, 631 S.W.3d at 328. This circumstantial evidence is consistent with McKnight knowing that the accident he caused was reasonably likely to result in injury to another. *See Curry*, 622 S.W.3d at 309; *Guevara*, 152 S.W.3d at 50; *see also Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi–Edinburg 1993, pet. ref'd) ("A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt."). Additionally, it was within the jury's province to determine that a collision that was forceful enough to cause a "very loud thumping sound" and Stedman's death is one that an actor would know is reasonably likely to result in injury. *See Boudreaux*, 631 S.W.3d at 328 ("A rational jury could also conclude that a

10

person engaged in an impact great enough to cause multiple blunt force injuries including multiple fractures all over the victim's body would have knowledge that the accident was reasonably likely to result in injury or death of a person."). We overrule McKnight's first issue.

### III.     IMPROPER SPECULATION

By his second issue, McKnight contends that the trial court erred when it permitted Investigator Wagner to opine on the reasonableness of McKnight's belief that he hit a garbage can.

### A.     Standard of Review & Applicable Law

"We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard, and we must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020). "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." TEX. R. EVID. 602. "Rule 701 allows a lay witness to give testimony in the form of opinions or inferences that are rationally based on the witness'[s] perception and helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue." *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002); *see* TEX. R. EVID. 701. "Crucially, rule 701's requirement that the testimony be based on the witness's perception presumes that the witness meets the personal-knowledge requirement of rule 602." *Madrigal v. State*, 347 S.W.3d 809, 814 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd).

"[W]hile a witness cannot possess personal knowledge of another's mental state,

11

he may possess personal knowledge of facts from which an opinion regarding mental state may be drawn." *Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997). Thus, "[l]ay testimony concerning the thought processes of others . . . should be admitted if the testimony is '(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [the] testimony or the determination of a fact in issue.'" *Madrigal*, 347 S.W.3d at 813–14 (quoting TEX. R. EVID. 701).

## B. Analysis

The parties address the issue of waiver in their briefs. However, we will assume without deciding that McKnight preserved his objection under both rules of evidence 602 and 701.

Here, Investigator Wagner testified it would be unreasonable for a person to believe that he had been involved in a collision with a trash can on Delaware. The basis for this conclusion was Investigator Wagner's own familiarity with the conditions of Delaware. Specifically, Investigator Wagner testified that Delaware had "two lanes divided by a grassy median and the other direction's two lanes, as well." He also explained that, on that stretch of Delaware, (1) there are no driveways that feed into the road, (2) trash pickup does not occur, and (3) residents do not put out their garbage cans. From these facts, Investigator Wagner concluded that it would be unreasonable for a person to believe that he had been involved in a collision with a trash can on Delaware. Because Investigator Wagner's opinion was an interpretation of his own experience with Delaware, this opinion satisfies the personal knowledge requirement. *See* TEX. R. EVID. 602, 701; *Fairow*, 943 S.W.2d at 899 ("An opinion will satisfy the personal knowledge requirement

if it is an interpretation of the witness's objective perception of events (i.e. his own senses or experience).").

"Once the perception requirement is satisfied, the trial court must determine if the opinion is rationally based on that perception." *Fairow*, 943 S.W.2d at 899–900. "An opinion is rationally based on perception if it is an opinion that a reasonable person could draw under the circumstances." *Id.* at 900. Texas roads are many and varied. When driving in a residential neighborhood, it may be reasonable for one to believe he has collided with a garbage can. When driving on an interstate highway in a metropolitan area, the same belief may seem otherwise unreasonable. Based on Investigator Wagner's knowledge of Delaware and its associated conditions, he concluded that this belief on this road was an unreasonable one. We conclude, in turn, that this was an opinion that a reasonable person could rationally draw under the circumstances. *See id.*

Lastly, the opinion must also "be helpful to the trier of fact to either understand the witness's testimony or to determine a fact in issue." *Id.* "While there is no bright line indicating when an opinion is helpful, general evidentiary considerations of relevance and balancing will invariably assist the trial judge in making [t]his determination." *Id.* Here, Investigator Wagner's testimony embraced an ultimate issue: McKnight's mens rea.[4] Therefore, his testimony cleared the final hurdle of rule 701. *See Webster v. State*, 26 S.W.3d 717, 725 (Tex. App.—Waco 2000, pet. ref'd). We conclude the trial court did not abuse its discretion in permitting this portion of Investigator Wagner's testimony, and we overrule McKnight's second issue.

---

[4] That the opinion embraced an ultimate issue did not make it objectionable. *See* TEX. R. EVID. 704.

13

## IV.    DEADLY WEAPON FINDING

By his third issue, McKnight contends that the jury's finding that he used or exhibited a deadly weapon during the commission of the offense or during the immediate flight therefrom was not supported by sufficient evidence.

### A.    Standard of Review & Applicable Law

We employ the same standard of review when reviewing the sufficiency of the evidence to support a jury's affirmative deadly weapon finding that we use to review the sufficiency of the evidence to support a factfinder's determinations on guilt and punishment. *See, e.g.*, *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009). In other words, we review the evidence in the light most favorable to the factfinder. *Id.*

When we review a deadly weapon finding, "it is a fact-specific inquiry, and the facts may or may not support such a finding." *Clark v. State*, 573 S.W.3d 367, 373 (Tex. App.—Beaumont 2019, no pet.). "In order to sustain a deadly-weapon finding, the evidence must demonstrate that: (1) the object meets the definition of a deadly weapon; (2) the deadly weapon was used or exhibited during the transaction on which the felony was based; and (3) other people were put in actual danger." *Brister v. State*, 449 S.W.3d 490, 494 (Tex. Crim. App. 2014). "[A] deadly weapon finding is appropriate on a sufficient showing of actual danger, such as evidence that another motorist was on the highway at the same time and place as the defendant when the defendant drove in a dangerous manner." *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). There is no requirement that "other motorists be in a zone of danger, take evasive action, or require appellant to intentionally strike another vehicle to justify a deadly weapon finding." *Id.* "The volume of

14

traffic on the road is relevant only if no traffic exists." *Id.*

The gravamen of the offense of failure to stop and render aid is leaving the scene of an accident. *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003). "Therefore, the relevant time period for determining whether the truck was used and exhibited as a deadly weapon is the time period after" the accident occurred. *Id.*

## B.    Analysis

Investigator Wagner represented that "Delaware's a major thoroughfare." From the testimony, at least three other cars were nearby at the time of the accident. Following the accident, McKnight reported that he "just kept going." Durst testified that McKnight "kept veering" towards the curb, and that she and Oliver briefly followed him. McKnight traveled approximately 1.1 miles to a nearby gas station. Officer McMichael's dash camera footage demonstrates that McKnight was straddling two lanes of traffic at the intersection of Delaware and Eastex Freeway while several cars were behind him. Investigator Wagner testified that, during this time, witnesses reported that McKnight was traveling "between 20 and . . . 35 miles an hour, and at one time he had his hazards on."[5] McKnight then pulled in "close to" a pump at the gas station and Officer McMichael conducted a traffic stop.

In the past, the court of criminal appeals "has relied on evidence that a defendant's driving was reckless or dangerous before concluding that a vehicle was used in a manner

---

[5] We note that Lindsay's 911 call came in at 9:08 a.m. At this time, he indicated he could still see McKnight's car. The dashcam footage from Officer McMichael's patrol car indicates that McKnight pulled into the gas station at 9:13 a.m. If these times are correct, this means that it took McKnight about five minutes to travel 1.1 miles. Based on our math, this indicates that McKnight traveled an average of 13.2 miles per hour during the commission of the offense.

15

capable of causing death or serious bodily injury." *Couthren v. State*, 571 S.W.3d 786, 793 (Tex. Crim. App. 2019). "Reckless or dangerous driving has been demonstrated by speeding, disregarding traffic signals, failing to maintain control of the vehicle, fishtailing, causing property damage with the vehicle, driving on the wrong side of the road, almost colliding with another vehicle, and failing to yield to traffic." *Id.* at 793.[6] Although we presume this list is not exhaustive, it is noteworthy that none of these things occurred during the relevant time period in this case. *See id.*; *Cates*, 102 S.W.3d at 738.

Durst's testimony that McKnight "kept veering" towards the curb was not coupled with testimony that anyone was placed in danger as a result of this action. *See Clark*, 573 S.W.3d at 374 ("The danger to others must be actual and not merely hypothetical."). Although McKnight took up two lanes at one point, there were no cars in front of him and he was stopped at a stoplight when this occurred. *See Brister*, 449 S.W.3d at 495 (concluding that the evidence was insufficient to support a deadly weapon finding when the evidence showed appellant was intoxicated and "briefly crossed the center line into the oncoming lane of traffic at a time at which there were very few, if any, cars in that lane"); *cf. Cates*, 102 S.W.3d at 738 ("That the truck stopped at the traffic light also refuted any conclusion that the truck was driven dangerously."). By all accounts, following the accident, McKnight engaged his hazard lights and drove at a slow speed to a location five

---

[6] The court of criminal appeals has declined to hold that driving while intoxicated will always result in a deadly weapon finding. *See, e.g.*, *Brister v. State*, 449 S.W.3d 490, 495 (Tex. Crim. App. 2014) ("We are unpersuaded that such an across-the-board holding of use of a deadly weapon is appropriate for all situations in which driving while intoxicated is alleged."). The act of driving while visually impaired is analogous as it is similarly inadvisable. Therefore, we are unpersuaded by the State's argument that McKnight's act of "continuing to drive visually impaired after the accident endangered all those he encountered on the roadway." *See id.*

minutes away. *See Cates*, 102 S.W.3d at 738 (concluding that the evidence was insufficient to support a deadly weapon finding when, among other things, "the truck was found at an address just five minutes away from the accident scene"). He pulled in "close to" a pump at the gas station, but Officer McMichael was still able to pull open the door closest to the pump and retrieve his driver's license during the traffic stop.

We conclude that, when viewed in the light most favorable to the jury's verdict, there is no more than a modicum of evidence to show that McKnight's driving during the relevant time period placed anyone in actual danger, and the evidence is therefore insufficient to justify the jury's deadly weapon finding. *See Jackson*, 443 U.S. at 320 ("[I]t could not seriously be argued that . . . a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt."). Because we have concluded that the evidence is insufficient, "[t]he proper remedy is to delete the deadly weapon finding." *See Williams v. State*, 970 S.W.2d 566, 566 (Tex. Crim. App. 1998). We sustain McKnight's third issue and modify the trial court's judgment to delete the deadly weapon finding. *See* TEX. R. APP. P. 43.2(b).[7]

### V.    MODIFICATION OF JUDGMENT

Lastly, the State points out that the trial court's judgment contains a clerical error. Specifically, the trial court's judgment reflects that McKnight was found guilty of violating "550.021/550.023 TRC." The State asks that we modify this portion to reflect that McKnight violated "550.021/550.023 TTC." *See* TEX. TRANSP. CODE ANN. §§ 550.021,

---

[7] Deleting this finding does not affect the applicable penalty or sentencing range; it only affects McKnight's eligibility for parole. *See* TEX. GOV'T CODE ANN. § 508.145(d)(1)(B), (d)(2); *see also* TEX. TRANSP. CODE ANN. §§ 550.021, 550.023.

550.023. It is unclear from the record what "TRC" refers to. However, what is clear from the record is that the jury found McKnight guilty of violating §§ 550.021 and 550.023 of the transportation code. *See id.*

"This court has the power to correct and reform the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so, or make any appropriate order as the law and the nature of the case may require." *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). For the sake of clarity, we grant the State's request and modify the trial court's judgment to reflect that the jury found Brown guilty of violating "550.021/550.023 TTC." *See id.*; TEX. R. APP. P. 43.2(b).

## VI. CONCLUSION

We modify the trial court's judgment to delete the deadly weapon finding and to reflect that McKnight was found guilty under "550.021/550.023 TTC." We affirm the trial court's judgment as modified.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
24th day of August, 2023.

18